# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

FOSTER GAY WILLIAMS, III,
    Petitioner,

v.                                        Case No 2:13 cv 87

UNITED STATES OF AMERICA,
    Respondent.

## MEMORANDUM OPINION, REPORT AND RECOMMENDATION

### I.
### Introduction

December 30, 2013 Petitioner - Defendant Foster Gay Williams III ("Williams"), proceeding *pro se*, filed a Motion Under 28 U.S.C. §2255 to Vacate, Set Aside, or Correct by a Person in Federal Custody ("Motion"). (Civil Action No. 2:13- cv-87, DE 1; Criminal Action No. 2:11-cr-12, DE 46[1].) February 20, 2014 an Order was entered directing Williams to initial and sign the Motion. (DE 52.) March 28, 2013 the court entered an Order To show Case against Williams. (DE 54.) April 14, 2014 Williams complied with the two prior orders of the court by signing and initialing the motion as directed. After initial review, the Court directed the United States to Answer Plaintiff's complaint within 28 days. (DE 58.) The United States filed its response on June 19, 2014 with accompanying Memorandum. ( DE 64 and 65 respectively.)

The undersigned now issues this Memorandum Opinion, Report and Recommendation on Petitioner's motion without holding an evidentiary hearing.

For the reasons stated below, the undersigned recommends that the District Judge deny Petitioner's motion to vacate.

---

[1] Hereafter all references will be to docket entries (DE) in the criminal case.

## II.
## Facts

April 19, 2011, a Grand Jury, sitting in Clarksburg, charged Williams in Counts 1, 2-12, 13-14, 15, and 16-18. Count 1 charged conspiracy to manufacture methamphetamine in violation of 21 U.S.C. § 846. Counts 2-12 charged Possession of Pseudoephedrine Knowing or Having reasonable Cause to Believe It Will Be Used to Manufacture Methamphetamine in violation of 21 U.S.C. § 841(c)(2). Counts 13-14 charged Possession of Materials used to Manufacture Methamphetamine With Intent to Facilitate Manufacture of Methamphetamine in violation of 21 U.S.C. § 843(a)(6) and 843(d)(2). Count 15 charged Maintaining Drug - Involved Premises in violation of 21 U.S.C. § 856(a)(2). Counts 16-18 charged Possession of Materials used to Manufacture Methamphetamine With Intent to Facilitate Manufacture of Methamphetamine in violation of 21 U.S.C. § 843(a)(6) and 843(d)(2).

Williams entered a plea of "not guilty" to all charges on April 29, 2014. He was detained pending trial. (DE 15-18.) On May 31, 2013, a change of plea hearing was scheduled for June 3, 2013. (DE 19.) Williams pled guilty[2] to Count 1 (conspiracy to manufacture methamphetamine in violation of 21 U.S.C. §846 on June 3, 2013. (DE 20-23.)

Pursuant to his written plea agreement dated May 16, 2013 (DE 22) Williams waived his right to appeal under 18 U.S.C. §3742 and to file a collateral attack under 28 U.S.C. §2255 if his "sentence was consistent with a Total Offense Level twenty-five (25) or lower[3]. (DE 22, ¶14.)

Williams filed a "Sentencing Memorandum (DE 25) on September 21, 2013. In the

---

[2]The remaining counts were dismissed at sentencing pursuant to the plea agreement.

[3]Since the total offense level for sentencing purposes was higher than 25, the waiver of appeal does not raise an issue with respect to Williams' ability to seek relief under 28 U.S.C. §2255

Sentencing Memorandum Williams challenged the probation office's five offense level increase under the guidelines contending 1) the total relevant conduct attributable to Williams should be the base offense level 26 (at least 10 but less than 40 grams of Ephedrine) agreed to in the plea agreement instead of the level 28 (at least 40 but less than 70 grams of Ephedrine) found by probation; and 2) Williams should not receive a three level increase pursuant to U.S.S.G. § 2D1.1(b)(10)(C)(ii) for creating a substantial risk of harm to human life due to the manufacture of methamphetamine.

With respect to the first challenge, Williams explained and argued that the United States did not ignore the Board of Pharmacy reports. Instead, he argues the United States correctly gave him the benefit of the doubt in the plea agreement stipulation of relevant conduct at level 26 because some of the pseudoephedrine purchases shown on Board of Pharmacy reports 1) were for legitimate purposes and 2) some could have been purchased by Williams' father and thereby improperly credited to Williams simply because he and his father share the same name. (DE 25, p. 1-2.)

With respect to the second challenge, Williams asserted there is a fundamental error in the pre-sentence report as to the location of the methamphetamine lab stemming from the United States' version of the offense. That version found on page 39 of the pre-sentence report states: "On January 28, 2011, and following the statement of the informant, Junior Police Chief Haller conducted surveillance of Williams's residence (**a trailer behind his parent's house**)." (emphasis added by the undersigned.) Williams argued Haller's statement was untrue. Williams argued his parents' residence was located at Route 3, Harding Road in Belington, West Virginia. Williams further argued that all the methamphetamine manufacturing materials were seized at "105 Rowe Avenue, Junior, West Virginia" ( the location of a single- wide trailer that was occupied by both the defendant and Miranda Arbogast). Williams argued the trailer is secluded, on its own piece of property, and

is 3.5 miles from his parents' residence. Williams argued that because of this error in the location of the trailer, the pre-sentence report was wrong in stating that "there were numerous individuals at risk." Williams also argued there was no evidence of any methamphetamine manufacturing in the EconoLodge room. (DE 25, p. 2-4.)

The United States filed its sentencing memorandum in support of the three level Guideline increase under 2D1.1(b)(1)(C)(ii). Therein it argues the increase should be applied "because the offense involved the manufacture of methamphetamine and created a substantial risk of harm to human life and the environment." (DE 28, p. 1.) The United States argued Williams manufactured methamphetamine instead of merely assisting others in its manufacture. It claims support for its conclusion in the following expect from p.2 of the discovery material - a portion of the Junior Police Department report:

> Over the past few months this officer has been investigating a possible Meth Lab manufacturing at 105 Row Ave. Junior, WV. Williams residence. A statement was obtained from a person who was purchasing precursors, sudafed for the accused and providing them to Mr. Williams to manufacture methamphetamine. Pharmacy records corroborated these transactions. On 1/28/11 at approx 1945 hrs. this officer conducted surveillance of the residence. **The windows had blankets over them and a strong chemical odor was detected coming from the residence**.[4] 1/29/11 This officer obtained a search warrant, and on 2/2/11 this warrant was executed. The finding of syringes all throughout the trailer, a black backpack with hoses, a jar with a hose taped to the lid, a can of Coleman fuel, a bottle of - acid, batteries cut in two, rubber gloves, empty Claritan pack, a spoon with filter. (emphasis added by the undersigned.)

The United States further argued Williams, not his girlfriend, possessed the chemicals found in the EconoLodge motel room for his use in manufacturing methamphetamine and not for the use of others. (DE 28, p. 3-4.)

---

[4] Williams argues window areas were covered with heavy curtain type materials serving as windows. Williams argues the "shake and bake" method of making meth does not produce strong chemical odors and the neighbors 1) did not smell any such odors and 2) did not make statements to the police that they smelled such odors.

The sentencing hearing was conducted November 29, 2011. Chief District Judge John Preston Bailey sentenced Williams to a term of imprisonment of 120 months with credit for time served, no fine, and 3 years of supervised release. (DE 30.) Chief Judge Bailey adopted the pre-sentence investigation report except for the offense level. The Chief Judge adopted the offense level of 26 stipulated by Williams and the United States in the plea agreement. The 120 month sentence was at the low end of the guideline range as calculated by the Chief Judge.

Williams appealed his conviction and sentence to the Fourth Circuit Court of Appeals on December 2, 2011. (DE 33.) The sole ground raised by Williams on appeal was that the District Court erred in applying the enhancement because he did not endanger anyone other than himself while manufacturing methamphetamine. (DE 43.)

The Fourth Circuit rejected Williams' argument and affirmed the judgment of the District Court by judgment order dated March 25, 2013. (DE 43 and 44.)

Williams did not appeal the decision of the Court of Appeals to the Supreme Court.

### III.
### Pending Petition

***Williams***:

Based on a review of Williams' petition, the undersigned finds he raises the following claims:

Claim One- Involuntary plea of guilty based on false information.

    A. "At the time taking the Plea agreement, I believe it was all true information, but now discovered I pleaded to false information." (DE 1, p. 2, ¶5 and p. 6.)

    B. "[T]hat appellant was set - up and that the informant was guilty but nothing happened to her." (DE 1, p. 2, ¶9 and p. 7-8.)

Claim Two- Ineffective assistance of counsel resulting in unintelligent guilty plea.

"[T]he plea agreement was not explained to Williams completely for

understanding." (DE 1, p. 9.)

**United States:**

    Claim One-    The claim of involuntary guilty plea is contradicted by the record of the plea hearing including Williams' under oath statements.

    Claim Two-    Procedurally Defaulted.

    Not supported by the totality of the record of the plea hearing.

IV.
Section 2255 Standard of Review

A motion made pursuant to 28 U.S.C. §2255 is a collateral attack on a conviction or sentence imposed in a separate proceeding. To succeed on such a motion, the movant must prove that the conviction or sentence was imposed in violation of the laws or Constitution of the United States; or the court, in imposing sentence, lacked jurisdiction; or the sentence exceeded the maximum authorized by law; or the sentence was otherwise subject to collateral attack. Because a §2255 motion seeks to deny, evade, or impeach a judgment, claims of error that have been previously raised and rejected on direct appeal of that judgment may not be raised again in a §2255 motion. United States v. Harrison, No. 96 - 7579, 1997 WL 499671, at *1 (4th Cir. Aug. 25, 1997)(unpublished.)

V.
Analysis

***Procedurally Defaulted Claims***

The only issue Williams raised on his direct appeal to the Fourth Circuit was that the District Court erred in applying the enhancement because he claims he did not endanger anyone other than himself while manufacturing methamphetamine. (DE 43.)

On direct appeal Williams did not raise claims that his plea was unintelligently made because his attorney did not explain the plea agreement to him sufficiently for him to understand it or that

his plea was involuntary because he pled believing certain information was true and he now alleges the information he relied on was untrue.

Generally, claims not raised on direct appeal may not be raised on collateral review because they have been procedurally defaulted. "The background for our discussion is the general rule that claims not raised on direct appeal may not be raised on collateral review unless the petitioner shows cause and prejudice. **See** United States v. Frady, 456 U.S. 152, 167-168, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982); Bousley v. United States, 523 U.S. 614, 621-622, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998). The procedural-default rule is neither a statutory nor a constitutional requirement, but it is a doctrine adhered to by the courts to conserve judicial resources and to respect the law's important interest in the finality of judgments." Massaro v. U.S., 538 U.S. 500, 504 (2003.)

However, with respect to most general rules there are exceptions. One such exception is the claim of ineffective assistance of counsel. "As Judge Easterbrook has noted, "[r]ules of procedure should be designed to induce litigants to present their contentions to the right tribunal at the right time." Guinan, supra, at 474 (concurring opinion). Applying the usual procedural-default rule to ineffective-assistance claims would have the opposite effect, creating the risk that defendants would feel compelled to raise the issue before there has been an opportunity fully to develop the factual predicate for the claim. Furthermore, the issue would be raised for the first time in a forum not best suited to assess those facts. This is so even if the record contains some indication of deficiencies in counsel's performance. The better-reasoned approach is to permit ineffective-assistance claims to be brought in the first instance in a timely motion in the district court under § 2255. We hold that an ineffective-assistance-of-counsel claim may be brought in a collateral proceeding under § 2255, whether or not the petitioner could have raised the claim on direct appeal." *Id.*

The Court is bound to construe the pleadings of a *pro se* claimant liberally. U.S. v. Gholson, 33 Fed.Appx 80, 81, (4th Cir. 2002) citing: Boag v. MacDougall, 454 U.S. 364, 365 (1982) and Gordon v. Leeke, 574 F.2d 1147, 1151 (4th Cir. 1978).

The United States argues both of Williams' claims are procedurally defaulted. However, the undersigned rejects that contention with respect to Claim Two. Construing that claim liberally, the undersigned construes Williams as saying that he pled guilty without understanding his plea agreement because his attorney did not explain it to him. However, that is not what he said during his Rule 11 change of Plea hearing.

Out of an overabundance of caution, the undersigned construes Williams' Claim Two as an ineffective assistance of counsel claim. Therefore, the undersigned concludes it is not procedurally defaulted by the failure to raise it on direct appeal to the Fourth Circuit, and will address it on the merits.

However, the undersigned concludes Williams' Claim One is procedurally defaulted by his failure to raise it in his direct appeal to the Fourth Circuit.

*Claim Two - Petitioner's Ineffective Assistance of Counsel Claim*

    **a.**    **Standard Governing Claims of Ineffective Assistance of Counsel**

The Supreme Court has set forth a two-prong test for determining whether a convicted defendant's claim of ineffective assistance of counsel warrants the reversal of his conviction. Strickland v. Washington, 466 U.S. 668, 687 (1984). First, "the defendant must show that counsel's performance was deficient." Id. Second, "the defendant must show that the deficient performance prejudiced the defense." Id. These two prongs are commonly referred to as the "performance" and "prejudice" prongs. Fields v. Att'y Gen. of Md., 956 F.2d 1290, 1297 (4th Cir. 1992).

To satisfy the "performance" prong, the defendant must demonstrate that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." Strickland, 466 U.S. at 687. However, a reviewing court does not "grade" trial counsel's performance, and there is a strong presumption that "counsel's conduct falls within the wide range of reasonable professional assistance." Carter v. Lee, 283 F.3d 240, 249 (4th Cir. 2002). Essentially, the reviewing court must not "second-guess" counsel's performance and must "evaluate counsel's performance 'from counsel's perspective at the time.'" Hunt v. Lee, 291 F.3d 284, 289 (4th Cir. 2002). Furthermore, the standard of reasonableness is objective, not subjective. . See Strickland, 466 U.S. at 688.

To satisfy the "prejudice" prong, the defendant must demonstrate that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687. Therefore, if counsel's errors have no effect on the judgment, the conviction should not be reversed. See id. at 69. A defendant who alleges ineffective assistance of counsel following a guilty plea has an even higher burden: "he must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 59 (1985); Hooper v. Garraghty, 845 F.2d 471, 475 (4th Cir. 1988). The Fourth Circuit has recognized that if a defendant "cannot demonstrate the requisite prejudice, a reviewing court need not consider the performance prong." Fields, 956 F.2d at 1297.

The Fourth Circuit has set forth two categories of decisions made by trial counsel. First, there are "personal" decisions that require consent from the defendant, such as the decision to enter a guilty plea, the decision to waive a trial by jury, the decision to appeal, and the decision of whether to testify at trial. See Sexton v. French, 163 F.3d 874, 885 (4th Cir. 1998). The second category includes decisions that "'primarily involve trial strategy and tactics,' such as 'what evidence should

be introduced, what stipulations should be made, what objections should be raised, and what pre-trial motions should be filed.'" Id. (quoting United States v. Teague, 953 F.2d 1525, 1531 (11th Cir. 1992)).

Clearly, Williams' Claim Two falls within the first category recognized in Sexton, *supra* at 885.

Analysis of Williams' Claim Two rests in large measure on the plea hearing and what Williams said under oath in response to the Court's questions during the Rule 11 plea colloquy.

### b. Petitioner's Guilty Plea Was Not Entered Knowingly and Voluntarily because his lawyer did not adequately explain the plea agreement to him.

A defendant's sworn representations made at a plea hearing "carry a strong presumption of verity" and "constitute a formidable barrier against any subsequent collateral proceedings." Blackledge, 431 U.S. at 74. Therefore, guilty pleas are not normally subject to collateral attack, but can be so challenged on the ground that the plea was not knowing or voluntary. Bousley v. United States, 523 U.S. 614, 621-22 (1998). A defendant may attack the voluntary nature of his plea by demonstrating that he received ineffective assistance of counsel. Tollett, 411 U.S. at 267. However, "in the absence of extraordinary circumstances, . . . allegations in a § 2255 motion that directly contradict the petitioner's sworn statements made during a properly conducted Rule 11 colloquy are always 'palpably incredible' and 'patently frivolous or false.'" Lemaster, 403 F.3d at 221 (citations omitted.)

First, the Court told Williams to follow along with his copy of the plea agreement while it was being summarized by the assistant United States Attorney and Williams said he would. (DE 63, p. 4.) After the summarization was completed, Williams was asked and confirmed that the agreement as summarized was the agreement he entered in to with the United States Attorney's

office. (DE 63, p. 8.) Williams told the court that he was 37 years of age, got his GED and could read, write, speak and understand English. (DE 63, p. 10.) Williams told the court his mind was clear and that there was no reason that he could not think, understand, speak with the Court or his Lawyer. (DE 63, p. 13.)

Second, Williams acknowledged reading the agreement several times before signing it. (DE 63, p. 19, l. 14-17.) Williams testified he understood the plea agreement before he signed it. (DE 63, p. 19, l. 18-20.) He further confirmed that his attorney and he discussed "each and every provision of that written plea agreement with (his attorney) Mr. Kornbrath before he signed it." (DE 63, p. 19, l. 21-24.) Williams testified nothing in the plea agreement and his understanding of the plea agreement had changed since he signed it on May 26, 2011 and the June 3, 2011 plea hearing. (DE 63, p. 20, l. 4-7.) Williams testified there was no provision or term in the plea agreement that he wanted to privately discuss with his counsel before the Court moved on to another subject. (DE 63, p. 20, l. 8-11.)

Third, with respect to the dangerousness enhancement under the advisory sentencing guidelines, the following colloquy is clear and convincing evidence that Defendant understood that portion of the plea agreement and did not need to further discuss it with his counsel:

> The Court: Do you also understand that you have entered into a stipulation in your plea agreement, paragraph 12, by which you admit and the Government admits that your relevant conduct for guideline sentencing purposes is more than 10 but less than 40 grams of pseudoephedrine; and that the possession of that was knowing and having reasonable cause to believe that it would be used, the pseudoephedrine would be used, to manufacture methamphetamine?
> The Defendant: Yes, I understand.
> The Court: Did you understand that by stipulating to that, you're saying to the Court, you don't have to take any evidence, Court, I agree that's the proof?
> The Defendant: Yes, I understand that.
> The Court: Do you understand that under your agreement it will be

> left up to the District Judge to determine from evidence presented at the sentencing hearing whether you ought to receive an increase of three levels or not, because the Government is going to claim that this offense that your are involved in involved the manufacture of methamphetamine, and created a substantial risk of harm to human life and to the environment?
> The Defendant: Yes, I understand.
> The Court: Basically what that says is you and the Government have agreed to disagree on that enhancement and fight it out at the sentencing hearing.
> The Defendant: Yes, I understand.
> The Court: And you understand that the District Judge will make the decision based on information provided at that sentencing hearing, including the presentence investigation report?
> The Defendant: Yes, I do.
> The Court: And you understand that it will be done by a judge, not a jury; and it will be done by a preponderance of the evidence, not beyond all reasonable doubt.
> The Defendant: Yes, I do.
> The Court: And you have no idea, no guarantee how that's going to come out for you?
> The Defendant: None whatsoever.
> The Court: You understand the higher the guideline number is, the more time you may get?
> The Defendant: Yes, I do.
> The Court: Is there anything about that that you want to further discuss with your lawyer?
> The Defendant: No, that's okay. (DE 63, p. 22, l. 9 - 24, l. 2.)

Fourth, although Williams' claims that he would not have pled guilty but for his belief in certain information he now claims to have discovered was false and notwithstanding that the claim is procedurally defaulted, the undersigned concludes from the following that the claim is patently frivolous, false, and inconsistent with William's prior Rule 11 testimony. Lemaster, *supra* at 221.

As an initial matter, Williams' claims are insufficiently pled. "Habeas petitions must meet heightened pleading requirements ...." particularly when they involve allegations of ineffective assistance of counsel. See McFarland v. Scott, 512 U.S. 849, 856 (1994). Accordingly, a petitioner must present evidence that his claims have merit. See Nickerson v. Lee, 971 F.2d 1125, 1136 (4th

Cir. 1992).

During Williams' plea hearing he was asked the following to which he gave under oath responses:

> The Court: Did you and Mr. Kornbrath discuss the elements that the Government must be able to prove in order for you to be found guilty or - - either on plea or at a trial?
> The Defendant: Yes, we have.
> The Court: So you understand from that discussion that what the Government must be able to prove is that this crime occurred within the jurisdiction of the Court, that would be Randolph County, within the Northern District of West Virginia; that it was you who committed the crime; third, that what you did was knowingly and willfully combine, conspire, confederate and agree and have a tacit understanding with other persons; and fourth, to commit an offense against the United States. And that offense was to violate Title 21, United States Code, Section 841 and 841(b)(1)(C). In other words, to manufacture methamphetamine, a controlled substance?
> The Defendant: Yes.
> The Court: Did you and Mr. Kornbrath discuss the evidence that the Government says it has and would use to prove you guilty of each of the elements of that offense?
> The Defendant: Yes, we have.
> The Court: Did you and Mr. Kornbrath review that evidence?
> The Defendant: Yes, we have.
> The Court: And, Mr. Williams, after your reviewed the evidence that the Government says it has and would use, did you come to a determination in your mind, independent of what Mr. Kornbrath may have already suggested to you, that the Government could prove its case?
> The Defendant: Yes. (DE 63, p. 14, l. 21 - p. 15, l. 23.)

At the conclusion of the Rule 11 plea colloquy, the undersigned received the following evidence from the United States which formed an independent basis in fact for accepting Williams' plea:

> AUSA Mr. Warner:
> ...[T]he case begins with Mr. Kennedy, with an arrest warrant for the defendant. That arrest warrant came out of Junior - - the Junior Police Department. It was a methamphetamine - related arrest

warrant.

And that investigation in Junior, Your Honor, the Junior Police Department had a statement from a person named Ryan Harris. Mr. Harris had said that in about mid December, he and this defendant went to Walgreens and to CVS, where at each store Williams gave Harris money to purchase Sudafed for him.

On December 26th, the same thing occurred at Kroger and CVS. Harris also bought Coleman fuel for Williams at Walmart. Another person named Fred Harris joined on the December 26th. Those are important, because this is a conspiracy that does involve more than one person, and I just wanted you to be aware that we had evidence, those statements we would have presented at trial.

Court: I presume you've turned that over to Mr. Kornbrath?
Mr. Warner: Yes, sir.
The Court: All right. Proceed.
Mr. Warner: So based on that Junior investigation, there was an arrest warrant and that leads into Officer Kennedy.

Direct Examination of Officer Kennedy by Mr. Warner:
Q. Would you please introduce yourself?
A. Sergeant S. Kennedy.
Q. And you're with the West Virginia State Police?
A. That's correct.
Q. And you agree there was a warrant that came out of Junior in about December of 2010, or maybe it was even later than that?
A. Yes, sir. I received a felony arrest warrant for Mr. Williams.
Q. When did you receive that?
A. It was faxed to us on February the 8th of 2011.
Q. What was that arrest warrant for?
A. It was an arrest warrant for manufacturing methamphetamine.
Q. Now, why did the Junior, Barbour County arrest warrant come to your attention as the state police in Elkins?
A. My first sergeant, Brian Utt, was contacted by an informant and we were told that Mr. Williams had an active felony arrest warrant for him out of Barbour County, and that he was currently staying at Room 131 at the EconoLodge there in Elkins, West Virginia.
Q. So did you act upon that information?
A. Yes sir, we did.
Q. What did you-all do?
A. First thing we did was contacted the front desk clerk at the EconoLodge. And we were made aware that Mr. Williams was actually staying in Room 131 at the EconoLodge.
Q. So did you go into that room?

A. We did. We received a faxed copy of the warrant. Went to the room and spoke with Ms. Ramsey. At that time - -
Q. Ms. Ramsey was the desk clerk?
A. She was the desk clerk at the EconoLodge. At thatt time my first sergeant had requested a room key in case Mr. Williams did not answer the room - - or answer the door. And she provided that key. And we wient to Room 131.
Q. What happened?
A. Upon arrival at the door, we knocked on the door, announced our presence. There was no answer. We knocked for a second time. Once again, received no answer.
My first sergeant unlocked the door using the key provided by the front desk clerk and we made entry into the room.
Q. What did you see when you got in there?
A. We cleared the room for our safety. After we had been in the room, we noticed a camouflage duffle bag leaning against the wall beside the bed. And out of that bag we could see a bottle with a hose coming out of the top of it.
Q. In plain view?
A. Yes, sir.
Q. Did you make any assumptions at that point what the bag with the bottle protruding from with hoses was?
A. Based on the bottle, we believed it to be a tool used to manufacture methamphetamine.
Q. So what happened then?
A. We backed out of the room, secured the room. And we contacted Corporal Anderson, who is one of our certified clandestine lab technicians.
Q. And he came over?
A. He was on standby until we actually encountered Mr. Williams. And then we called him to come over.
Q. How did you encounter Mr. Williams?
A. We left Room 131 and went across the parking lot. And we later observed a F-150 pickup truck back into the parking space in front of Room 131. And a white male exited the vehicle, attempted to get into Room 131. And my first sergeant and I identified him as Mr. Williams.
Q. Sergeant Utt recognized him?
A. Yes. Sir.
Q. Okay. So did you - all approach him?
A. We did. We approached him and took him into custody at that time.
Q. And what happened?
A. He was put in handcuffs. My first sergeant asked him what he had inside of his room. Mr. Williams made the statement

that there was a backpack in his room that contained items to make meth. But he claimed the items inside the backpack belonged to his girlfriend, Miranda Arbogast.

Q. With this information that there was items to make meth in the motel room, did you-all search the room?

A. We did not. We waited until Corporal Anderson arrived on the scene. At that time, he requested we obtain a search warrant or a consent to search.

Q. Did you do that?

A. We did.

Q. Which one?

A. We obtained a consent to search from Mr. Williams, wherein he signed, along with his mother, Bonnie Williams, signed as a witness.

Q. What did you find in the room?

A. Inside the room we did located, as I said before, the backpack that was laying against the wall.

Q. Incidently, checking with the desk clerk, this room was rented to Mr. Foster Williams?

A. It was. We obtained documents where it was rented to Mr. Williams, signed by Mr. Williams, and that he was paying cash for the room.

Q. So what did you find inside the room?

A. Inside the room, first thing Corporal Anderson did was he removed the backpack, emptied the contents on the sidewalk in front of the room. The backpack was found to contain a one-gallon can of Coleman fuel, one quart of hydrochloric acid that was half full, a 16 ounce bottle of hydrogen peroxide that was three - quarters full, one lithium battery, one Roebic Crystal Drain Opener, and one box of instant ice compresses. We photographed those items and we re-entered the room, where we found a one gallon glass pickle jar that was on the left side of the bed that contained an unknown clear substance.

We searched the drawers of the room, found some Walmart bags that contained the receipt that depicted Mr. Williams had purchased Coleman fuel at Walmart. And we also observed three syringes, a spoon, empty boxes of sleeping pills in the night stand beside the bed.

Q. Based on Mr. Anderson's expertise, are those items commonly used to manufacture methamphetamine.

A. Yes, sir.

Q. Now, he said that the backpack belonged to his girlfriend?

A. He said the backpack was his, but the items contained inside belonged to his girlfriend.

Q. Did you ever interview her?

A. I did not. But a statement was taken from her at a later date by Trooper Hebner of the Elkins detachment.

Q. What did she say?

A. She told us that Mr. Williams was cooking meth on a regular basis. And his mother, Bonnie Williams, was buying the pseudoephedrine for him. And that he was also purchasing it himself and standing in front of the pharmacies and asking people to buy the pills for him.

Q. Now, do you have some reason to believe that Miranda was in fact there at that particular hotel room on the particular day that you entered it?

A. Yes, sir, I do.

Q. What's that?

A. We obtained a picture of her the following day from her Facebook account, where she's on there. And we can tell that she's in the room at the EconoLodge based on the picture that she's standing in front of is consistent with the picture in Room 131. The cation below the picture says "Miranda partying all night long."

Q. Were some of the items sent to the state police lab for testing?

A. Yes, sir. We obtained a sample of the clear liquid that was in the pickle jar, we also obtained a sample of an off-white paste that was in the Gatorade jug that had the white hose coming from it. And we sent about a - - approximately a six-inch piece of clear - - tubing, which was in the bottle where Corporal Anderson stated that the finished product would come into.

Q. Did the state police test that and get results?

A. They did.
Item number one, which was the clear liquid, indicated the presence of petroleum distillate.
Item muber two was the off-white paste, which was found to be - - contained pseudoephedrine.
And item three, which was the clear tubing, was found to contain traces of methamphetamine.

Q. Did you get a chance to pull a Board of Pharmacy report for Mr. Williams or did someone from the BCI do that for you?

A. Corporal Anderson has access to those records, and he did send me a Board of Pharmacy report for Mr. Williams.

Q. There are a number of buys of pseudoephedrine for Mr. Williams in December 2010, and also in January and February and March and April of 2011; is that right?

A. Yes, sir, that's correct.

Q. How many times did, based on that, Mr. Williams buy pseudoephedrine at local pharmacies in January of 2011?
A. January 20111, there are seven purchases of pseudoephedrine.
Q. How about in March of 2011?
A. There are six purchases of pseudoephedrine.
Q. Back up to February of 2011, which is the month that you entered that room. What was the day you entered that room?
A. It was on February - - February the 8th.
Q. And he purchased pseudoephedrine two days before that, didn't he?
A. Yes, sir. There's a - - well, the last one before that entry date would have been January 26th of '11. And then the next date was February 20th of '11.
Q. Oh, okay.
A. So it would have been approximately 11 days.
Q. I'm incorrect that he bought two days before?
A. Correct. The earliest date before that I have here on the Board of Pharmacy is 1/26 of '11. We entered on 2/9 of '11.
Q. Incidentally, he didn't post - - he must have been arrested and stayed for additional time based on this and posted bond; is that right.
A. Yeah. He was released on bond on February 9th, 2011.
Q. I asked that just to explain how he would have bought more pseudoephedrine after that arrest.
A. He was release on February 9th and he again purchased pseudoephedrine on February the 20th.
Q. Now, as part of your investigation, did you visit some - - let me back up.
First, there is - - there is a Walmart receipt you mentioned found in the motel room?
A. Yes, sir.
Q. Did you take that receipt to the local Walmart?
A. I did. I took it there and met with the loss prevention manager, which is David Foy, and he provided me with video of Mr. Williams in Walmart purchasing Coleman fuel.
Q. Did you visit some other stores in the Elkins area?
A. I did. I visited Ace Hardware in Elkins and Liggetts' Supply in Mill Creek.
Q. Was there some evidence that Mr. Foster - - Mr. Williams had bought items commonly used to manufacture methamphetamine at those two stores?
A. Yes, sir, there is.
Q. Can you summarize what that is?
A. In Mill Creek, he purchased a gallon of muriatic acid; at the Ace Hardware in Elkins, there's several purchases of muriatic

acid, Coleman fuel, and clear tubing.

After the United States' presentation of the independent basis in fact to support the plea, the Court engaged Williams in the following colloquy:

> The Court: Mr. Williams, were you able to hear the testimony of the officer"
> The Defendant: Yes, I was.
> The Court: So far as your involvement is concerned in this crime, is there any disagreement with the officer's testimony?
> The Defendant: No, sir, there's not.

Not only did Williams fail to specifically plead facts and offer proof that would refute the independent basis in factual support for his plea, his own sworn acknowledgment that the United States' proffer and testimonial evidence correctly outlined his involvement in the commission of the crime directly refutes and contradicts his frivolous assertions[5].

In sum, Williams cannot satisfy the "prejudice" prong of the Strickland, test. *supra* at 688.

Even assuming counsel made errors, inasmuch as those errors had no effect on the judgment, the conviction should not be reversed. *Id.* at 687.

## VI.
## RECOMMENDATION

For The foregoing reasons, the undersigned **RECOMMENDS** that Williams' Motion Under 28 U.S.C. §2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody, (Civil Action No 2:13cv87, DE 1 and Criminal Action No 2:11 cr 12, DE 46) be **DENIED** and the same be **DISMISSED FROM THE DOCKET OF THIS COURT WITH PREJUDICE.**

---

[5]1. Chief Jody Haller of the Junior police saying there was a strong odor at the trailer;
2. The shake and bake method producing a strong odor or not producing a strong odor.
3. Blankets over the windows at the trailer.

Within **fourteen (14) days** after being served with a copy of this report and recommendation, any party may file with the Clerk of Court written objections identifying those portions of the recommendation to which objection is made and the basis for such objections. A copy of any objections shall also be submitted to the Honorable John Preston Bailey, Chief United States District Judge. Failure to timely file objections to this recommendation will result in waiver of the right to appeal from a judgment of this Court based upon such recommendation. 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia. The Court further directs the Clerk of the Court to mail a copy of this Report and Recommendation to the *pro se* Petitioner Foster Gay Williams, III.

DATED: July 1, 2014

s/ *John S. Kaull*
JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE